IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Briefs October 19, 2001

## TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. FRANCES PYLE BATES

**A Direct Appeal from the Probate and Juvenile Court for Lauderdale County**
**No. J4-156**
**The Honorable Rachel Anthony, Judge**

---

**No. W2001-01267-COA-R3-JV - Filed January 10, 2002**

---

This is a termination of parental rights case. Francis Pyle Bates (hereinafter Mrs. Bates) appeals from the final decree of the Probate and Juvenile Court of Lauderdale County which terminated her parental rights to her three minor children, T. M. P., born March 28, 1991; J. R. P., born August 15, 1992; and R. D. P., born July 25, 1994. For the reasons hereinafter stated, we affirm the trial court's final decree.

**Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Probate and Juvenile Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

William Dan Douglas, Jr., Ripley, For Appellant, Frances Pyle Bates

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, For Appellee, State of Tennessee Department of Children's Services

## OPINION

On February 26, 1998, after the filing of a petition, the probate and juvenile court entered an order bringing Mrs. Bates' three (3) children in protective custody of the court and placing temporary care and custody of the children with the Tennessee Department of Children's Services (hereinafter "TDCS"). According to the petition filed on February 26, 1998, two of the children have "many un-excused absences from Ripley Primary School and have been sent home on numerous occasions for head lice." The petition also states that upon the petitioner's visit to Mrs. Bates' residence, "there was no electricity, no heat, and there were no sheets on any of the beds. Further, the children's mother was admitted into St. Joseph Hospital due to her being unstable, and had placed herself and the children at risk by turning the gas stove on, later being found by family members."

A guardian ad litem was duly appointed for the three (3) children, and after an evidentiary hearing on December 21, 1998, the court entered an order on January 11, 1999 sustaining the petition and finding the children to be dependent and neglected within the meaning of T.C.A. § 37-1-102 et seq. The court also found that reasonable efforts to prevent removal of the children have been made, and placement of the children in foster care is in the children's best interests. The court ordered that custody of the children shall remain with TDCS.

On January 31, 2000, the TDCS filed a "Petition for Termination of Parental Rights"of the biological parents of the three (3) children, Frances G. Childress Pyle (Mrs. Bates) and James O. Pyle, II[1] (hereinafter "Mr. Pyle"). The petition points out that the children were found to be dependent and neglected and that the children have been in foster care continuously since February 26, 1998. The petition also states that it is the petitioner's intention to place the children for adoption.

The petition alleges that Mrs. Bates has been substantially non-compliant with her statements of responsibilities in the plan for foster care. The petition also alleges that Mrs. Bates and Mr. Pyle have willfully abandoned and willfully failed to visit and/or support their three (3) children. The petition further alleges that the children have been removed from Mrs. Bates' home by order of the court for a period of six (6) months and that the conditions which led to the removal of the children still persist; that there is little likelihood that the conditions will be remedied at an early date so that the children can be safely returned to the parent in the near future; and that the continuation of the parent/child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. The petition alleges that Mrs. Bates is incompetent to adequately provide for the further care and supervision of the children because her mental condition is presently so impaired and is so likely to remain so that it is unlikely that she will be able to assume or resume the care of and responsibility for her three (3) children.

The petition further alleges that the termination of any parental rights of Mrs. Bates and Mr. Pyle is in the best interests of the children.

On March 23, 2000, the court appointed Rebecca Mills, Attorney, as the guardian ad litem for the three (3) children. Mrs. Bates' answer admits that she is the biological mother of the three (3) children and that they were found to be dependent and neglected on January 11, 1999. However, the answer denies that Mrs. Bates has abandoned her children and states that she has tried to visit with the children on numerous occasions and all efforts have been denied without explanation. The answer also denies that Mrs. Bates has been non-compliant with her statements of responsibilities in the foster care plan; denies that she is incompetent to adequately provide and care for her children because of her mental condition; and denies that the termination of her parental rights with regard to her three (3) children is in the best interests of her children.

---

[1] By order entered January 23, 2000, Mr. Pyle's parental rights were terminated by default judgment. No appeal was taken and he is not involved in this appeal.

A nonjury trial was held on January 29, 2001, and on February 22, 2001, the court entered a "Final Decree Terminating Parental Rights of Francis Pyle Bates" which provides in pertinent part:

**FINDINGS OF FACT**

1. The children were removed from the home of their mother, Frances Pyle Bates, pursuant to a Protective Custody Order of this Court on February 26, 1998, based on a Petition alleging the children had many unexcused school absences; there was no electricity or heat in the home and no sheets on the beds. The mother was hospitalized because of her unstable behavior and attempted suicide. She had turned on the gas stove while the children were in the home. The children also reported sexual abuse by a cousin and the mother's paramour.

2. At a hearing on December 21, 1998, the Court found the children to be dependent and neglected, which finding was confirmed by the Court's Order of January 11, 1999.

3. Since the children's removal, the mother has paid no support for the children. She worked at Pizza Hut for one year and now makes $200.00 per month cleaning trailers. Her last three visits were April 1, 1999, December, 1998, and September, 1998. The children's therapist and the Tennessee Baptist Children's Home (which acts as a case manager for DCS) felt that the mother's visits were disruptive to the children; they had regressive behavior, aggressive outbursts, could not sleep at night and experienced recurrent memories of the sexual abuse that occurred to them when in the mother's custody. The Department told the mother to contact her attorney when she inquired about visits. She did not petition the Court for visits, nor did she maintain contact with the Department. She did not send the children letters or cards.

4. In 1998, the mother was diagnosed at Center for Children in Crisis at LeBonheur Hospital (hereinafter "CCC") and at Professional Counseling Services with major depression and borderline personality disorder. Persons with borderline personality disorder have intense fear of abandonment, expect people to rescue and protect them and often become enraged, depressed and suicidal. Such a person is very focused on herself and her needs and has difficulty focusing on the needs of others. The mother began therapy at Professional Counseling Services in early 1998, first attending a depression group and then individual therapy; she was not consistent in her attendance

or compliant with treatment, ending in September, 1999. Her therapist addressed anger management, parenting skills, and developing mood and life stability. For periods of time, she maintained stability, but would relapse and become unstable again. In December of 1998, at the merits hearing on the dependency and neglect petition, her therapist advised the Court that the mother's personality pattern of mood instability and instability in relationships would prevent her from consistently and safely parenting her children. Her diagnosis is long-standing and can only be controlled, not changed. The CCC report of June, 1998, also indicates that the likelihood of "her being able to provide a safe environment for her children is guarded to poor." Attempts of suicide are a continuing possibility with this diagnosis.

The mother returned to therapy in June, 2000. When her new therapist first observed her, she appeared to be depressed and showed characteristics of borderline personality disorder; she still had not maintained stable relationships, nor a stable environment and was experiencing conflict with her husband. The mother was hospitalized in July, 2000, because she was homicidal and suicidal. From June to the trial date, the mother attended therapy only four times, with five "no shows" and two rescheduled cancellations. In January 2001, the therapist met with the mother and her current husband and observed a great deal of conflict in their relationship, no stability within the home and financial problems. This therapist does not believe the mother has the ability to parent the children.

5. When the children came into the state's custody in 1998, they were frightened, worried, thin, undernourished and full of anxiety. They also reported to their therapist that they had been sexually abused by their mother's paramour. Their therapist has worked with them since August, 1998, and reports that they now are "blooming." She stated that they need strong nurturing, a stimulating home environment and permanency. In her opinion, returning the girls to their mother's home would be devastating, would cause the girls to regress and not be safe for them.

6. The mother admitted she is not capable of caring for her children at the present time but said she could overcome her problems and be ready for them in six months to one year. She depends on her husband's disability check and $200 per month for cleaning trailers for income and has lived in five residences in the last two years.

# CONCLUSIONS OF LAW

1. There is clear and convincing evidence to support the termination of the Respondent mother's parental rights to the referenced children.

2. The mother has abandoned these children within the definition of Tenn. Code Ann. § 36-1-102 (1)(A)(i).

3. The children have been removed from the mother's home for nearly three years and the conditions which led to their removal still exist and in all probability will continue to exist which would cause these children to be subjected to further abuse or neglect and prevent the children's safe return to the mother's home; there is little likelihood these conditions will be remedied at an early date so the children could be returned to the mother's home in the near future; and the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

4. The mother's mental condition is impaired to the point that she is incompetent to adequately provide for the care and supervision of the children and this impairment is likely to remain so that she will not be able to assume care of and responsibility for the children in the near future.

5. It is in the best interests of the children that the mother's parental rights be terminated. Pursuant to the factors found in Tenn. Code Ann. § 36-1-113 (i), she has not made an adjustment in her circumstances to make it safe for the children to be in her home; it does not appear possible for the mother to make a lasting adjustment in her circumstances; the mother has not maintained contact with the children; there is not a meaningful relationship between the mother and the children; return to the mother would negatively affect the children's emotional and psychological condition; the mother's mental and emotional status would be detrimental to the children and would prevent her from effectively providing safe and stable care and supervision for the children; and the mother has failed to pay child support.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:**

1. That all of the parental rights of the mother Frances Pyle Bates to the children [T. M. P., J. R. P. , and R. D. P.] be and the same are hereby terminated based on the findings of fact and conclusions of law set forth above.

2. That the complete custody, control, and guardianship of the said children is awarded to the Tennessee Department of Children's Services, with the right to place the said children for adoption and to consent to such adoption *in loco parentis*.

3. That this decree shall have the effect of forever severing all of the rights, responsibilities, and obligations of Frances Pyle Bates to the said children and of the said children to said parent arising from the parental relationship; that said parent is hereafter not entitled to notice of proceedings of the adoption of the children by another, nor has Frances Pyle Bates any right to object to such adoption or otherwise to participate in such proceedings nor hereafter, at any time, to have any relationship, legal or otherwise, with said children; and that there are no other parental or guardianship rights which must be terminated prior to making said children available for adoption.

Mrs. Bates has appealed and presents the following issue as stated in her brief:

Whether the trial court erred in terminating the parental rights of the Appellant, Frances Pyle Bates, to the children, [T. M. P., J. R. P., and R. D. P].

The appellee, TDCS, has also filed issues for review which we have summarized into one issue which is, in essence, the same issue raised by the appellant. Therefore, we will not re-state the appellee's issues.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

T.C.A. § 36-1-113 (c) (2001) provides:

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

T.C.A. § 36-1-113 (g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3) (A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedies at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

\* \* \*

(8)(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and

(ii) That termination of parental or guardian rights is in the best interest of the child.

T.C.A. § 36-1-113 (i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Parental rights may be terminated only when continuing the parent-child relationship poses a substantial threat of harm to the child. *See Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995).

T.C.A. § 36-1-113 (c) requires that one or more of the asserted statutory grounds must be proved by clear and convincing evidence and the court must determine, also by clear and convincing evidence, that termination is in the child's best interests. *See In re: B.B.*, No. M1999-00643-COA-R3-CV, 2000 WL 794360 (Tenn. Ct. App. June 20, 2000); Tenn. Code Ann. § 36-1-113(c) (2001). Mrs. Bates argues that the trial court erred in finding grounds supported by clear and convincing evidence to terminate her parental rights. The trial court based its decision to terminate her parental rights on T.C.A. §§ 36-1-102(1)(A)(i); 36-1-113 (g)(1), (3) and (8)(B); and 36-1-113(i).

In addressing the issues for review, we have reviewed the record and have summarized the testimony of each witness.

## LESLIE STUZMAN

Ms. Stuzman testified that she has a master's degree in counseling psychology and is licensed as a psychology examiner. She had been employed as a therapist with Professional Counseling Services for five years. She first met Francis Pyle Bates in early 1998, when Mrs. Bates was attending a depression group. Ms. Stuzman then began to see Mrs. Bates individually for her depressive symptoms when her children were removed from her custody. Ms. Stuzman met with Mrs. Bates from early 1998 to September 1999, and she, along with other members of her staff, diagnosed Mrs. Bates' condition as major depression and borderline personality disorder. She noted that there was some improvement for a short period of time, but that Mrs. Bates would always relapse and become unstable and depressed again. Ms. Stuzman wrote a letter to the court concerning Mrs. Bates' condition for a December 1998 hearing. The letter stated that due to Mrs. Bates' personality pattern of instability in relationships, Mrs. Bates would not be able to consistently

and safely parent the children. Ms. Stuzman has not seen Mrs. Bates since 1999, when Mrs. Bates moved to Dyersburg. Ms. Stuzman testified that Mrs. Bates' personality disorder is a "long-standing diagnosis," stating:

> [i]t is a personality pattern that develops from early childhood onward and it takes a lot of commitment on the part of the client and a lot of consistent therapy to change, but even then, it's something that is only controlled, not changed. Somebody with borderline personality disorder will likely have that throughout their life.

In explaining borderline personality disorder, she noted:

> [it] is a very intense fear of abandonment, wanting to hold on very tightly to relationships and having high expectations that people in their lives will rescue them and protect them and then even with a very minor incident will feel abandoned and betrayed, often become enraged and depressed, suicidal and a person is also very focused on themselves and very focused in on their own needs and it's hard to recognize the needs of others.

On cross-examination, Ms. Stuzman commented that Mrs. Bates' suicidal tendencies could continue with this borderline personality disorder. She stated that she tried to treat Mrs Bates' problems during their individual therapy and in group therapy. Case management services were also provided to help try to maintain Mrs. Bates' stability. Because Mrs. Bates was not always compliant with her treatment, there apparently was little success with her treatment.

## JUANITA CHISM

Ms. Chism had been employed with Professional Counseling Services in Dyersburg and Ripley, Tennessee for eight (8) months. She holds a master's degree in social work and a certified master's of social work which allows her to counsel people. She began seeing Mrs. Bates in June of 2000, when she was contacted by Ms. Tasha Woods, Mrs. Bates' case manager. Mrs. Woods wanted Mrs. Bates to have some therapy due to the situation with her children and because her parental rights might be terminated. Ms. Chism observed that when she first saw Mrs. Bates she had already been diagnosed with major depressive disorder and borderline personality disorder and that Mrs. Bates was depressed on the day that Ms. Chism saw her. Ms. Chism testified that Mrs. Bates "basically has not maintained a stable relationship, her environment has not been stable also during this time, there has been a lot of conflict with her spouse, several separations during that time." Mrs. Bates did not show up for five scheduled appointments. She has seen Mrs. Bates only four times since June of 2000. In July of 2000, Mrs. Bates stated to her that she was having a crisis and that her husband had threatened suicide if Mrs. Bates left him. Mrs. Bates told her that she felt smothered and that there was a lot of conflict. Mrs. Bates was homicidal to her husband and suicidal, but Mrs. Bates denied having past suicidal or homicidal tendencies with the children. She

testified that when she met Mr. Bates, he was very depressed, low functioning, and she noted that he was unable to read or write. Although Mr. and Mrs. Bates did not relate any domestic violence to her, the boundary issues that Mr. and Mrs. Bates were having were "intrusive to each other" and domestic violence could be a possibility "if someone else was with them." Ms. Chism saw Mrs. Bates from June 26, 2000 through January 4, 2001, and Mrs. Bates never told her she was employed. Ms. Chism noted that Mr. Bates is on disability, but does some handiwork. Mrs. Bates felt like she could provide for her children with her husband if she has access to the trailer. Both Mr. and Mrs. Bates have financial problems and they moved three (3) times during the time Ms. Chism was seeing Mrs. Bates. Ms. Chism opined that she does not feel that Mrs. Bates has the ability to parent her children.

On cross-examination, Ms. Chism testified that even if Mrs. Bates was compliant in her treatment, that she still would not be able to get into a position of stability. She could not speak about the children because she has had no contact with them. Ms. Chism opined that she felt that Mrs. Bates would harm her children emotionally, not physically. Ms. Chism felt that Mrs. Bates recognized that she could not visit her children because her visits upset the children.

## CHARLES JOPLIN

Mr. Joplin testified that he has been employed with the TDCS for two years and has a master's degree in Biblical studies. He is a case manager, which involves looking after children and visitation with birth parents. The children came into the deparment's custody in 1998, but problems with the Pyle family date back to 1996. The department's records indicate a 1997 report that a household member observed one of the children performing oral sex on a cousin. Another is that one of the children complained of not having enough to eat in the home. This child's clothing was always too large, and he observed that she had no coat, was always filthy, and had head lice. He opined that Mrs. Bates has not had a stable home since he began with the department two years ago.

On cross-examination, Mr. Joplin testified that no visitation has been allowed to Mrs. Bates over the last two years. When Mrs. Bates called about visitation, Mr. Joplin told her to talk with her lawyer about petitioning the court for visitation. He testified that he knew the children became disruptive after seeing their mother, but the TDCS never interfered with Mrs. Bates' visitation.

## MELINDA WILBANKS

Ms. Wilbanks testified that she has been employed as a social worker with the Tennessee Baptist Children's Home for the last six years and that she has a bachelor's degree in social work. She is one of the people who ensures that the children are healthy, that they go to the doctor, and that they attend school. She is familiar with Mrs. Bates' visits with her children, and her last visit was on April 1, 1999. When the children would come in for a visit with their mother, they would be happy to see her and would "love on her" and ask how she was doing. The children appeared to be concerned about their mother. At visitation, the children and Mrs. Bates would play games and talk about different things. The girls wondered if their mother had food and where she was living or if

she had a job.  Mrs. Bates would bring Easter baskets and they would fly kites and have good visits, but the children were worried about their mother.  An issue concerning "Big John" came up during a visitation, and the children said that he was a man living with their mother who had sexually abused them.  The children would go into detail about the abuse after the visits and would have flashbacks and nightmares about what happened to them.  Ms. Wilbanks testified that she told Mrs. Bates not to talk about "Big John" to the children, and Mrs. Bates agreed, but the subject would come up every now and then.  The children were concerned about their mother being with "Big John".  According to Ms. Wilbanks, there were no visits by Mrs. Bates between January and March of 1999.  During this time, the children calmed down and did not have nightmares and were no longer getting sick to their stomachs.  She further stated that their behavior was much better at this time.  After the April 1, 1999 visit, the children regressed, and T. M. P. had aggressive outbursts.  T. M. P. was the protector and would tell the other two children not to talk about what happened before at the home, because nothing happened.  Ms. Wilbanks recommended that the visits be ceased because of the children's behavior after each visit.  One of the children had a nightmare about "Big John" hitting her, and the child was worried about her mother.  Every time there was a visit, everything was brought up again.  The children are "doing fine now;"  their behavior is better, and they are going to school and church with foster parents.

On cross-examination, Ms. Wilbanks testified that the children would not act up during the visits with their mother, but that it was after their mother left when the problems arose.  When they would visit with their mother, all of the memories would be brought up again.  Ms. Wilbanks noted that Mrs. Bates had not sent any birthday or Christmas presents or letters to the Baptist Home for her children.  Ms. Wilbanks stated that the children's report cards are good.  The children have been in the same foster home since their removal from Mrs. Bates.  Ms. Wilbanks also stated that Mrs. Bates mentioned she would like to know where her kids are living and where they are in school.  Ms. Wilbanks testified that the foster parents told her that Mrs. Bates and "Big John" had followed them a couple of times.  Ms. Wilbanks further testified that she had just learned that "Big John" had been convicted of sexual abuse, but she was not sure whether he was convicted for the abuse of the Pyle children or other children because he was the perpetrator for other kids referred to her agency.

**SUSAN TENNANT**

Ms. Tennant testified that she had been employed with LeBonheur Hospital at the Center for Children and Parents as a family therapist for thirteen (13) years.  She has a master's degree in social work and is a licensed clinical social worker.  She testified that she works exclusively with children who have been sexually, physically and emotionally abused and neglected.  Ms. Tennant testified that she began seeing the Pyle children because there were allegations of severe neglect and abuse.  Ms. Tennant had her first visit with the children on August 19, 1998, and she reviewed an evaluation of the mother, Mrs. Bates, prior to her visit with the children.  She approached the children with knowledge about their mother's condition of personality disorder, and when she saw the children, they were very frightened, worried, under-nourished and anxious.  The children stated that they stayed hungry most of the time and that sometimes neighbors would bring them food.  Ms. Tennant testified that J. R. P. ate constantly and was worried and would cry about the possibility of not having

breakfast in the morning. Ms. Tennant further testified that Tiffaney felt responsible for taking care of her mother. The children also complained about bugs and mice and they made allegations of sexual abuse against "Big John". After Ms. Tennant began working with the children, they "started blooming" and were "doing very, very much better." Ms. Tennant stated that the children need a "strong nurturing, stimulating, home environment, and perhaps most of all, permanency." Ms. Tennant opined that she did not think that the children and Mrs. Bates have a relationship at this point. After the visitations with Mrs Bates ceased, she testified that the children reacted positively. Ms. Tennant also opined that if the children were to go back with their mother, they would regress to a point where she questions that therapy would benefit them. Ms. Tennant believes that these children will need periodic therapy for the rest of their life.

On cross-examination, Ms. Tennant testified that there is nothing Mrs. Bates can do about her personality disorder. Ms. Tennant testified that any contact with the mother would be detrimental even in a supervised situation. She stated that she observed two visits by the mother with her children and they were "ok", but she testified that the problem is the children's subsequent reaction to those visits. Ms. Tennant stated that the children have told her that they fear going back to their mother, and the children must "feel safe" before they can be helped. Ms. Tennant testified that the girls reported to her that "Big John" was with their mother waiting down the street during the visits. It is Ms. Tennant's opinion that the children cannot be safe living with their mother.

**FRANCES BATES**

Mrs. Bates testified that she knows what her disorder is and understands that it really cannot be helped. She understands that she could lose her parental rights as the mother to her children, and she believes that the court should consider family counseling which, as she stated, has not yet been done to unite the family. Mrs. Bates feels that she and her children should discuss the feelings and aspects of what is going on with her illness as well as what is going on with the children and child support. She did not send child support because she did not know how much to send and because visitation had been cut off and she did not know if the children would even get the money. Mrs. Bates also testified that she did not have much money. Mrs. Bates admitted in her testimony that she cannot take care of her children right now, but wants visitation. She understands that the children have suffered because of her illness, and that she did not realize what was happening with the children after each visitation. She testified that her visitation had been terminated because the children would get upset, but family counseling would help the children overcome being upset after visitations. Mrs. Bates further testified that "Big John" has not been a part of her life since she was told that he had molested her children. Mr. Eppler ("Big John") is in prison for nineteen (19) years for molesting and raping his own sister's children. She finds it "ironic that nothing was done on the part of [her] children as far as him being prosecuted." Mrs. Bates testified that she is willing to do whatever the court orders with regard to her children.

On cross-examination, Mrs. Bates testified that she has problems dealing with her marriage. She further stated that her husband is the only person in the family making a living and that he is on disability. She is currently trying to get on disability. She further stated that she does not have

problems paying the rent and utilities. She has a computer and phone, but relies on public transportation. She testified that she was homicidal only towards "Big John" for what he allegedly did to her daughters. Mrs. Bates testified that she could take care of her children in six (6) months to a year and that she would continue counseling with Ms. Chism. She admitted the "no shows" at her appointments in the past, but attributes them to a lack of transportation. Mrs. Bates testified that Ms. Hogue, who lives a couple of trailers down the road, is her support person and helps her with her condition. She described Ms. Hogue as like a "mom". Mrs. Bates stated that her husband, Mr. Bates, is dyslexic, blind in one eye and cannot read or write and that she helps him. Mrs. Bates acknowledged that she could in time take care of her girls and Mr. Bates. Mrs. Bates agrees that her children need permanency and structure. Mrs. Bates testified that "family counseling" has been attempted as a method of therapy. Mrs. Bates testified that she cleans trailers in the park where she lives for $6.50 per hour and makes about $200.00 per month, and this is her only source of income. Mrs. Bates has also worked for Pizza Hut in the last 2 years. She testified that she worked there one (1) year as a floater and shift leader. She stated that lately things have "fallen downhill." She is happy that her children are blooming under their present situation (foster care). Mrs. Bates testified that she bought her children a snow-globe for Christmas and she has Barbie dolls and other stuff packed away for their birthdays. Mrs. Bates stated that she would have to take the Greyhound bus to make sure that her children made their therapy appointments or rely on her neighbor for transportation. Mrs. Bates testified that she was suicidal last summer, July 2000, and she feels suicidal when she is threatened. She felt threatened by social services at one point when they told her that they were going to take her parental rights away. She testified that she could get suicidal again, but she "don't think so, not at this point in time." She testified that her children are more important than she is, but she believes the "family unit" is more important.

After a review of the entire record, we find that all of the grounds for the trial court's decision terminating Mrs. Bates' parental rights are supported by clear and convincing evidence. Contrary to Mrs. Bates' argument that the TDCS did not use reasonable efforts to aid and assist her in attempts to be reunified with her children, there is testimony in the record indicating that Mrs. Bates was allowed to visit her children until April 1, 1999, when it was recommended by Ms. Wilbanks that Mrs. Bates' visitation should be ceased because of the negative effects it had on the children.

Specifically, the record indicates by clear and convincing evidence that Mrs. Bates has abandoned her children within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(i), because she intentionally failed to pay child support. *See In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Mrs. Bates testified that she paid no child support to her children and further testified that although she does not have much money, she earns approximately $200.00 per month cleaning trailers.

The record further indicates by clear and convincing evidence that the conditions which led to the children's removal from Mrs. Bates' care still persist and that there is little likelihood that the conditions will be remedied at an early date; that Mrs. Bates is incompetent to adequately provide for her children because of her mental condition; that there has been no lasting adjustment made by Mrs. Bates to care for her children; that there has been no meaningful relationship established

between Mrs. Bates and her children and that it is in the children's best interests to terminate Mrs. Bates' parental rights to her children.

The record shows that the children have been living with the same foster parents since their removal from Mrs. Bates' care in February of 1998 and are doing well. Mrs. Bates testified at the trial held on January 29, 2001, that she cannot take care of her children at this time and she stated that it would take approximately six months to one year before she could take care of her children. Ms. Tennant testified that the children need "a strong nurturing, stimulating, home environment, and perhaps most of all, permanency" and Ms. Stuzman testified that Mrs. Bates' borderline personality disorder is a condition that people "likely have . . . throughout their life." Ms. Stuzman also testified that Mrs. Bates' suicidal tendencies could continue with this borderline personality disorder and that Mrs. Bates would not be able to consistently and safely parent her children. The record reveals that although Mrs. Bates' condition may be treated with "consistent therapy", Mrs. Bates often did not show up for scheduled appointments. There is also testimony in the record from Ms. Tennant that the children and Mrs. Bates do not have a relationship at this point and Ms. Tennant stated that if the children were to go back with their mother, "they would be devastated, [and]. . . they would regress so much that [she]. . . questions if any therapy would be beneficial for them." Other testimony from the record indicates that Mrs. Bates would not be able to get into a position of stability and that Mrs. Bates could emotionally harm her children.

Accordingly, the final decree of the trial court is affirmed. This case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellant and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.