IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 20, 2012

**IN THE MATTER OF ABIGAIL F. K.**

**Appeal from the Hamilton County Juvenile Court**
**No. 244.734    Suzanne Bailey, Juvenile Judge**

**No. E2012-00016-COA-R3-JV-FILED-SEPTEMBER 14, 2012**

This appeal concerns the termination of parental rights. The subject child is the eighth born to the appellant mother. The appellant mother failed a prenatal drug screen prior to the birth of the child at issue, so the appellee Tennessee Department of Children's Services took the child into protective custody three days after birth. A permanency plan was adopted and the mother made efforts to comply with her permanency plan responsibilities. The Department filed a petition to terminate the mother's parental rights as to this child. The juvenile court terminated the mother's parental rights based on the grounds of substantial noncompliance with the permanency plan and persistence of conditions. The mother now appeals only as to the grounds for termination. We reverse as to the ground of substantial noncompliance with the permanency plan but affirm as to the ground of persistent conditions. On that basis, we affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed in Part and Reversed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

John Allen Brooks, Chattanooga, Tennessee for Respondent/Appellant J.R.K.

Robert E. Cooper, Jr., Attorney General and Shanta J. Murray, Assistant Attorney General Nashville, Tennessee for Petitioner/Appellee State of Tennessee Department of Children's Services

# OPINION

## FACTS AND PROCEEDINGS BELOW

The child at issue in this case, Abigail F. K. ("Abigail") was born into difficult circumstances. She is the daughter of Respondent/Appellant J.R.K. ("Mother") and W.M.G. ("Father"). Abigail is Mother's eighth child; none of Abigail's seven siblings are in Mother's custody. Mother's parental rights as to five of the seven siblings have been involuntarily terminated; the other two siblings are in the legal custody of relatives. Mother has a lengthy history of criminal convictions for offenses such as public intoxication and disorderly conduct. While Mother was pregnant with Abigail, she was given a prenatal drug screen; it was positive for methamphetamine, cocaine, and amphetamines.

Mother and Father were never married.[1] Abigail was born on August 30, 2010. Shortly after Mother gave birth to the child, Father came to the hospital and got into an argument with Mother. Father allegedly shoved Mother and spat on her while she was holding Abigail. As a result, Father was expelled from the hospital.

Three days after Abigail was born, she was removed from Mother's home and taken into protective custody by Respondent/Appellee Tennessee Department of Children's Services ("DCS"). Since then, she has remained in foster care.

In light of all of these circumstances, on September 7, 2010, DCS filed a petition in the Juvenile Court of Hamilton County, Tennessee, seeking to have Abigail declared dependent and neglected. The next day, the Juvenile Court granted DCS's petition and awarded DCS temporary custody.

On October 13, 2010, Mother signed the initial DCS permanency plan for Abigail, with dual goals of reunification with Mother and adoption. The permanency plan assigned Mother numerous tasks. In various places in the permanency plan, it indicated that Mother was to remain clean and sober, follow all recommendations of an assessment from the treatment center and treatment specialist, participate in drug screens, sign all necessary releases for DCS to communicate with a treatment specialist, resolve and refrain from all illegal actions and from associating with individuals who participate in illegal actions, have a mental health intake assessment to address reasons for using alcohol and drugs and stressors related to Abigail being in custody, follow all recommendations of that assessment, become financially responsible, provide DCS with proof of legal and verifiable income, pay child support in

---

[1]No father is listed on Abigail's birth certificate. However, later testing confirmed that Father is Abigail's biological parent.

accordance with the child support guidelines, and provide a safe, stable residence for a period of six consecutive months. The plan listed March 2, 2011 as the date of the expected outcome.

In the months that followed, Mother began making changes in her life consistent with the permanency plan. Mother began attending a weekly support group for chemical dependency at a drug treatment facility. From September to December 2010, she attended daily Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings.

In November 2010, Mother underwent a clinical parenting and mental assessment with psychological examiner Alice Greaves, Psy.D. ("Dr. Greaves"). In the assessment, Dr. Greaves diagnosed Mother with borderline personality disorder, anxiety disorder, and cocaine and marijuana dependency, which Mother self-reported as in remission. Dr. Greaves' parenting assessment recommended counseling and therapy sessions. In December 2010, Mother began therapy sessions with marriage and family therapist William A. Lockett ("Lockett"). In addition, Mother attended supervised visits with Abigail, lasting two to three hours per visit, twice a week.

In February 2011, Father came to the residence of Mother's mother, the maternal grandmother, where Mother was living. After Father entered the residence, a physical altercation ensued in which Father "cracked a chair over [Mother's] head." Mother was knocked unconscious and taken to the hospital. Mother later admitted that, prior to Father's physical assault, she had consumed a substantial amount of alcohol. After the incident, Mother pressed domestic violence charges against Father, which resulted in his incarceration in May 2011. Mother later obtained an order of protection against Father.

On July 13, 2011, DCS filed a petition to terminate the parental rights of both Mother and Father. With respect to Mother, the petition asserted two grounds for termination. First, pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the petition alleged that Mother failed to substantially comply with the statement of responsibilities set forth in the permanency plan for the child, in that she continued to engage in substance abuse and associate with individuals who engaged in illegal activity, and had not addressed her underlying issues from past trauma. Second, pursuant to Tennessee Code Annotated § 36-1-113(g)(3), the petition alleged that the conditions that led to removal of the child from Mother's home persisted and prevented the safe return of the child to Mother's custody. The petition asserted that Mother remained financially and mentally unstable and claimed that her history of drug use and domestic violence created a high risk for the child.

The Juvenile Court conducted the trial on the petition for termination of parental rights over two non-consecutive days, October 10, 2011 and October 24, 2011. At the time of the trial,

Father was still incarcerated for assaulting Mother. Prior to the testimony and evidence, Father agreed not to contest the termination of his parental rights, so the matter proceeded only as to the termination of Mother's parental rights.

Mother testified at the outset of the trial. Mother acknowledged her extensive history of drug and alcohol abuse and conceded that her parental rights were terminated as to five of her seven other children. Her two older children were being raised by relatives. Asked about testing positive for methamphetamine and cocaine while pregnant with Abigail, Mother explained that an ex-boyfriend, the father of several of her children, had come by her house to borrow her telephone. While he was at her house, unbeknownst to Mother, he allegedly put liquid methamphetamine in her soft drink. Mother admitted that DCS had indicated the ex-boyfriend as a sex offender. However, she insisted that, since the above-described incident, she had had no contact with him.

Mother was also asked about the incident of domestic violence by Father at the hospital when Abigail was born. In the incident, she said, Father "spat at me and kind of shoved on my shoulder" while she was holding newborn Abigail. As a result, Mother had to have Father removed from the hospital.

Mother testified that she understood her responsibilities under the DCS permanency plan for Abigail. She maintained that she had fully complied with the requirements of the permanency plan.

Mother understood that, under the permanency plan, she was required to get a drug and alcohol assessment and follow the recommendations from it. Mother testified that she had undergone three alcohol and drug assessments, one immediately after Abigail was removed from her custody and then two more in July or August 2011. Mother's first assessment recommended that she attend 90 AA and NA meetings in 90 days. Mother testified that she completed this recommendation and also attended a support aftercare meeting. The attendance sheets documenting Mother's attendance at these meetings were submitted into evidence. Mother admitted that she relapsed in February 2011, in the incident in which she was hospitalized after Father's domestic assault. She confirmed that she consumed alcohol on that one occasion, characterizing it as "a one-time thing" that involved only alcohol and not illegal drugs. After this incident, Mother said, she was asked to undergo another assessment, which she did "as soon as [she] was asked." After this, Mother testified, she continued to attend AA and NA meetings, but attended more sporadically. Mother also underwent random drug screens, all of which were clean, and she had an AA sponsor. Mother said that she did not participate in a drug treatment program after Abigail was removed from her custody. She explained that the treatment programs would not admit her

because she was not on drugs. Mother said, however, that she had completed drug and alcohol programs four times, before Abigail was born.

Addressing the permanency plan requirement that she refrain from illegal activity and from associating with persons who engage in such activity, Mother emphasized that she had no criminal convictions since June 2007 and had refrained from associating with individuals who participate in illegal activity. Mother noted that, after the February 2011 domestic violence incident, DCS encouraged her to get an order of protection against Father, and she did so four months later in June 2011. Mother conceded past arrests for driving on a suspended driver's license, so consequently she did not drive and did not have a car. She said that she took a bus to visit Abigail; a friend would take her to the bus stop on her way to work.

Mother also testified that, since September 2010, she had been working on her mental health in accordance with the permanency plan. Mother said that she was attending counseling and therapy sessions with Lockett working on issues dealing with her past trauma and her future goals. Mother was seeing Lockett twice a month. She testified that her therapy sessions with "Dr. Bill" were useful in helping her deal with stress, plan ahead, and prioritize. Mother had not been prescribed any medicine for her mental health issues and none had been recommended.

With respect to her financial responsibilities under the permanency plan, Mother described her employment over the past year. For about three years, Mother worked on and off at Mac. D Evans Farms, loading fruit trucks and doing anything else that needed to be done. At the time of trial, she was working there primarily on Sundays, and sometimes when needed during the week, for a total of approximately ten to twenty hours per week at $7 per hour. At some earlier point, Mother had worked as a personal assistant for an insurance agent but was no longer employed in that capacity. Mother said she had applied for jobs with two temporary services agencies. Mother borrowed an undetermined sum of money to attend an online school for medical billing and coding; she had been attending since July 2010 and expected to complete the program in January 2012. Mother said that the Juvenile Court had not yet set her child support obligation for Abigail.

At the time of trial, Mother was living with her 77-year-old mother in her mother's home. The house is paid for and Mother said that she and her mother share the monthly bills. Mother acknowledged that DCS had suggested that she move out of her mother's home, though she did not think that it was a requirement of the permanency plan. She said that DCS suggested that she move from her mother's home because it was near the home of Mother's ex-boyfriend, the alleged sex offender. Mother stated, however, that she had not

moved out of her mother's home because she was taking care of her mother and she did not even know where the ex-boyfriend was living. Mother testified that DCS caseworker Adrian Boyd had visited the home and found nothing wrong with it.

Mother testified that, approximately twice a week, she travels by bus to visit with Abigail, visits that last two to three hours. The bus ride to the visit is approximately an hour each way. Mother acknowledged missing several visits; she explained that the reasons for the missed visits varied greatly, such as an abscessed tooth, transportation issues, the DCS supervisor's vacation, a stomach virus, Abigail having an earache, and the like. Mother said that she also attended online parenting classes, witnessed by an appropriate supervisor.

Mother was asked how her situation was different this time, as opposed to her circumstances when her parental rights as to her five other children were terminated. Mother pointed out that, prior to the other termination proceedings, she was not attending AA and NA meetings. She also said her attendance at counseling "does help." Mother also said that, this time, she has "a little bit more sense." She stated as follows:

> I know where I have been and where I want to be and where I don't want to go back to and what I want for Abigail. And I have a little bit more sense on how to avoid the same things that I did wrong before. And I have an idea of how to avoid things like that before they can happen with [Abigail].

She also emphasized her intent not to lapse back into her prior destructive behavior:

> [C]ocaine is the drug of the devil. Methamphetamine I'm allergic to. I've never liked prescription pills, even if they were prescribed, I still don't really like them. And marijuana causes me to have brain seizures. So I have adverse reactions to the drugs that is more of a reason for me to not go back to them.

The trial court also heard testimony from Dr. Greaves, the therapist at the Center for Individual and Family Effectiveness who performed Mother's parenting assessment. Dr. Greaves explained that she performed the parenting assessment in November 2010 by administering a variety of tests to Mother, interviewing Mother for approximately an hour, and reviewing Mother's social history. Dr. Greaves noted significant trauma in Mother's history, including abandonment by her father, physical abuse by a sister, sexual crimes against her as a teenager, and teenage substance abuse. She explained the basis for her primary diagnosis of borderline personality disorder, as well as the basis for the other diagnoses of anxiety disorder and substance abuse and dependence.

Borderline personality disorder, Dr. Greaves explained, is "characterized by instability of behavior, mood and self image." She said that borderline personality disorder "tends to be the outgrowth of a past trauma history." She testified that the disorder often causes interpersonal problems, including impulse control and "frequent conflicts and swinging back and forth between idealizing and despising other individuals." A person with borderline personality disorder, Dr. Greaves said, is at "risk to damage a child . . . in that person's custody," and has the potential to damage "a child's ability to attach emotionally with others." Dr. Greaves' report also said that the disorder could lead to Mother "neglecting or not recognizing the emotional needs of a child," as well as creating "mood, anxiety, image and behavioral problems in a child." Dr. Greaves added:

> [I]f a person deals with the [past] trauma issues and doesn't make the unconscious mistake of repeating the past trauma in the life of their own child, then they can learn, functionally at least, [to] create an awareness that would make them a lot more capable whether they completely deal with the borderline issue or not.

Dr. Greaves also diagnosed Mother as having an anxiety disorder and "substance dependence issues with cocaine and marijuana, both of which are reportedly in remission." In her testimony, Dr. Greaves clarified that the characterization of Mother's substance abuse as "in remission" was based only on what Mother reported to her, including her explanation of the positive drug test two weeks before Abigail was born.

Dr. Greaves also explained the significance of the score Mother received on two of the assessments administered to her. The first was the global assessment relational function ("GAR"), assessing different aspects of Mother's relationships with other people. Mother received a score of 25 on a scale of 100, a score Dr. Greaves described as "low." This was based on Mother's failure to address the emotional and psychological needs of others in her household, primarily her children, and her failure to form relationships stable enough to continue. On the global assessment of functioning (GAF), Mother received a score of 58 on a scale of 100, which Dr. Greaves also described as low: "[T]o go lower than 58 would have put [Mother] in the category of people who might be verging on psychosis or thinking about suicide or things like that. So 58 is . . . a cut-off score for me [to] function in the world." Based on Mother's history and her overall assessment, Dr. Greaves said, there was "a strong potential that [Mother] would have difficulty as a parent." Counseling was essential, Dr. Greaves said, and for the counseling to be successful, it would be necessary for Mother to be open and honest, disclose substance abuse relapses to the counselor, and work on her past trauma issues.

Mother's counselor, William Lockett, testified about Mother's counseling sessions with him. Pursuant to Dr. Greaves' recommendation, Mother began seeing Lockett in December 2010 and, as of the time of trial, had seen him 21 times. Initially, Lockett said, Mother had substantial functionality issues, including problems with organization and time management, lack of employment and lack of transportation, and she was facing potential contempt charges for her failure to pay criminal fines assessed against her. While in therapy, Lockett testified, Mother has made "significant strides" functionally from when he first began seeing her. Lockett stated that since therapy began, Mother began attending AA and NA meetings; got Father out of the home; established appropriate boundaries with her mother and sister; maintained steady employment from May to September 2011, which ended through no fault of her own; and was taking online courses to become a medical billing assistant. Lockett was under the impression that Mother had maintained sobriety the entire time, and only learned of her February 2011 alcohol relapse at trial. With long-term substance addiction, Lockett noted that "[y]ou . . . normally expect an occasional relapse." Had he known about Mother's relapse, Lockett said, he would have shifted the focus of therapy to address sobriety issues.

While Lockett spoke highly of Mother's strides in achieving functionality, he saw less progress emotionally, characterizing her progress in that area as "slight improvement." In addition to the diagnoses made by Dr. Greaves, Lockett also diagnosed Mother with chronic post-traumatic stress syndrome, stemming from traumatic events that occurred when she was much younger, some in childhood. He commented that it takes a great deal of courage to confront such issues, and said that Mother suffers a great deal of emotional pain when she tries to talk about them. Ultimately, he said, Mother "just can't force herself to go there." Lockett opined that the underlying emotional issues stemming from the earlier trauma are a "very significant" factor in why Mother had taken the life path that she had. Asked if Mother was working hard to straighten out her life, Lockett agreed that she had, adding that "she's put forth the effort." However, with respect to her trauma issues, Lockett said that Mother is "reluctant to go there . . . you can never climb in someone else's mind to know whether it's conscious reluctance, or not." Lockett said that she will need continued counseling for an undetermined but "significant period of time."

The DCS case worker, Adrian Boyd ("Boyd"), testified about Mother's compliance with the permanency plan and grounds for termination. Boyd had been assigned to this case since Abigail was born in September 2010, and in the past had worked on DCS cases concerning four of Mother's older children. Boyd outlined Mother's obligations under the permanency plan and testified as to each.

Boyd addressed the permanency plan requirement that Mother maintain stable employment and be financially responsible. Boyd said that Mother had been employed in many jobs, early on with an insurance company and later cleaning houses, working at Waffle House, or

working at the fruit stand.[2]  Boyd said that in some of those jobs, Mother did not turn in check stubs to verify her employment but did submit receipts for cash payment.  The pay, Boyd said, "was not adequate [for Mother] to care for herself and a small child."  Boyd confirmed that Mother had earned her GED and was enrolled in online coursework to become a medical technologist.

Boyd next addressed the permanency plan requirement that Mother have a stable residence.  Boyd stated that Mother still lived with her 77-year-old mother in the house in which she lived prior to Abigail's birth.  Boyd explained DCS's stance on Mother continuing to live in this home:

> We had a meeting with [Mother] on June the 1st [2011].  We explained to her, that because of her safety, as well as the safety of her mother, had been compromised on several occasions; that she needed to seek new residence.
>
> [Mother] did explain that her mother is 77-years old, it's a family residence, but she had the incidents where the meth was put into her drink. [Father] came in on one occasion, hit her in the head with a chair. Came in on another occasion, stole her bike and threw her purse in the woods.
>
> We told her she needed to seek another residence before a child could be placed in the home with her because they were pretty much coming and going and said he came through the back door, explained how unsafe that was.

Boyd acknowledged that the three-bedroom home was paid for, only Mother and the maternal grandmother lived there, and Mother had obtained a restraining order against Father to keep him away from the home.  Nevertheless, Boyd said, DCS recommended that Mother find a new residence.

Pursuant to the permanency plan, Boyd testified, Mother underwent an alcohol and drug assessment.  The initial alcohol and drug assessment was clean.  After Mother's alcohol relapse in February 2011, a second assessment was recommended and Mother complied.  Boyd confirmed that neither drug and alcohol assessment recommended inpatient treatment for Mother, in light of her clean drug screens.

Boyd confirmed that Mother had completed a parenting class, as required.  As to Mother's visits with Abigail, Boyd first stated the Mother had missed half of the scheduled visits, and

---

[2]Boyd referred to Mother's "boss" at the insurance company "mak[ing] some child support payment on [Mother's] behalf."  There is no explanation in the record about what this meant.

then later in her testimony corrected to state that Mother had missed approximately 40% of the scheduled visits. Some of the absences were beyond Mother's control. In the initial visits with the child, Boyd testified, Boyd fixed Abigail's bottle, but after a while, Mother "got the hang of it" and started feeding and changing Abigail herself.

Overall, in assessing whether Mother had completed her responsibilities under the permanency plan, Boyd claimed that Mother had failed to maintain steady employment, had missed a substantial number of visits with Abigail, and did not meet the requirement for a stable residence because she had not left her mother's home to find a new residence. Boyd said these were the only plan responsibilities Mother had not completed.

Pursuant to her required mental health assessment, Boyd said, Mother had been going to counseling sessions with William Lockett. However, Boyd noted, in the counseling sessions, Mother remained reluctant to deal with her past trauma. This was emphasized by Boyd when she was asked why DCS felt that Mother's parental rights as to Abigail should be terminated:

> I've worked with [Mother] for many years on four other children. A lot of the same issues then still exist today. Just the compromise of safety, A&D issues, just based on her history, not only that, but with her treatment specialist, they did . . . state that she was still showing some reluctance in completing and following through with her trauma, in dealing with it. And just throughout the whole case she's just kind of stayed middle ways throughout the case, do enough and kind of fall off and do enough and kind of fall off.

However, Boyd conceded that Mother was trying this time; she said: "I do think [Mother is trying] and I even told [Mother] this, I do think she's trying. I've seen her make more efforts with this case than I have seen her on any of the other children. By now she would have disappeared, and we wouldn't know where she was." Nevertheless, Boyd could not recommend that Mother be given custody of Abigail and supported termination of Mother's parental rights. As to Abigail's best interest, Boyd testified that Abigail needs a stable and permanent home now and that there is a family ready and waiting to adopt her.

The Juvenile Court heard testimony from Salina Taylor, the DCS assistant responsible for transporting Abigail to her visits with Mother. Taylor observed many of the visits. Taylor stated that early on in October, November, and December 2010, Mother made all of her visits with Abigail. After January 2011, Mother began missing more visits. All told, Taylor said, Mother missed 32 out of 77 visits with Abigail. Most often, if Mother was unable to attend a visit, she would call or otherwise let Taylor know. Asked to describe the relationship between Mother and Abigail that she observed during the visits, Taylor said that she did not believe they were particularly bonded. Taylor said that Mother holds, feeds, and changes

Abigail, and that Abigail knows her, but she also noted that the television is normally on during the entire visit, and Abigail tried so often during the visits to crawl toward Taylor that a divider was erected to keep Abigail in the room with Mother.

Finally, Abigail's foster mother testified. She stated that Abigail had lived with her family for fourteen months. The foster mother described Abigail as doing really well and meeting all of her developmental milestones. The foster mother testified that Abigail had bonded to her family, especially her four-year-old daughter, and that the family hoped to adopt Abigail. At the conclusion of the proof, the Juvenile Court took the case under advisement.

On December 9, 2011, the Juvenile Court entered an order terminating Mother's parental rights as to Abigail. The Juvenile Court first determined that DCS had proven the ground of substantial noncompliance with the permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). The order recited what it saw as Mother's responsibilities under the plan:

> [M]aintain a stable home environment free from alcohol and drugs; obtain a mental health assessment and follow the recommendations; obtain a drug and alcohol assessment and follow the recommendations; submit to random drug screens; maintain stable housing, free from illegal activities and individuals who participate in illegal actions, provide proof of sufficient legal verifiable income to support herself and the child, visit regularly with the child, and pay child support in accordance with Tennessee guidelines.

It found that Mother "failed to comply with such responsibilities in a reasonable manner." The Juvenile Court acknowledged that Mother had undergone counseling with Lockett but noted that Mother had failed to inform Lockett of her February 2011 alcohol relapse. The Juvenile Court recalled Lockett's testimony that Mother had experienced significant trauma, his characterization of progress as "slow," and his assessment that Mother was "reluctant to engage in or work on trauma issues and that the emotional pain is such that she will not allow herself to deal with past trauma." The order referred to Dr. Greaves' testimony that Mother needed "to work on her past trauma issues to help with her Borderline Personality Disorder." The order did not refer to Lockett's testimony regarding Mother's progress on functionality, resulting from counseling and Mother's efforts.

Recalling the testimony of DCS case worker Boyd, the Juvenile Court found: "Mother has had many jobs, the most recent of which Ms. Boyd has received no verification." It also cited Boyd's assertion that Mother had "not maintained stable employment." The order recognized that Mother was taking care of her mother in the house that is owned by her family but stated that Mother is "still living in the same home where she was allegedly drugged and was knocked out by a chair." The order stated that Mother's "knowing failure

-11-

to correct her circumstances and to attempt to fully complete her Permanency Plan makes it unsafe for her to parent this child." While the Juvenile Court order acknowledged that inpatient drug and alcohol treatment was not "officially recommended by any assessment," it also stated pointedly that "Mother has never completed alcohol and drug treatment" and elsewhere stated that Mother "began going to AA/NA meetings but has not had alcohol or drug treatment in at least three (3) years."

As alternate grounds for termination of Mother's parental rights, the Juvenile Court also found that Mother has not remedied the conditions which led to the removal of Abigail from her custody, that those conditions still persist, and that in all probability these conditions would cause the child to be subjected to further abuse and neglect, if she were returned to Mother's custody. Tenn. Code Ann. § 36-1-113(g)(3). The Juvenile Court referenced Mother's unstable housing and employment issues and her ongoing mental health and addiction issues. The order noted Lockett's recommendation that counseling be continued for a significant period of time and his inability to identify a time frame for treatment of her mental disorders. From this, the Juvenile Court concluded that, since Mother "will not attempt to work on the issues causing her mental health concerns she cannot remedy the issues which led to the removal of the child." Mother's reluctance to engage in treatment of her past trauma, the Juvenile Court found, would "not provide the child with any hope of having a home with her at any early date."

The Juvenile Court also found other persistent conditions:

> The Mother's home is persistently unsuitable for this child due to her financial and mental instability, in addition to her ongoing alcohol use and the possibility of domestic violence, all of which create high risks for this child. After having tested positive for Meth, Amphetamines, and Cocaine during her pregnancy due to an alleged "drug string," she tested positive for Oxycodone on September 7[], 2010 with no explanation, and she admits to being intoxicated in February 2011 during a violent incident with the Father. The Father (of this child) and [Mother's ex-boyfriend] (the father of her other children) have been inappropriate to be around her and the child, and it demonstrates a history of bad decision-making on the part of the mother for which she has not corrected through counseling or other treatment. As late as February 2011, she was keeping company with known drug users and an indicated sex offender. Her continued history of alcohol and drug dependence without completion of treatment, her inconsistent employment, and mental health issues make it unsuitable for the child to return to her at any early date.

As to Abigail's best interest, the Juvenile Court went through many of the factors listed for consideration in Tennessee Code Annotated § 36-1-113(i). It found that Mother had not made an adjustment in her circumstances that would make it safe for the child to be in her custody. It found that Mother had "failed to engage in counseling in a meaningful and productive way." The order states: "No child would be safe in the home of Mother, as they could be the unintended victims of her unstable mental capacity, the possibility of drug and alcohol use, and her persistent choice of inappropriate males." It cited Mother's use of "drugs both during and after her pregnancy" as abuse of her child, and found that Mother's home was "unhealthy and unsafe." A change of caretakers for Abigail, the trial court observed, would have "a highly negative effect" on the child, who had been in the same foster home since she was taken into protective custody as a newborn. For these reasons, the Juvenile Court held that termination of Mother's parental rights was in Abigail's best interest. Mother now appeals.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

Mother appeals the grounds for termination of her parental rights. First, Mother contends that the trial court erred by finding by clear and convincing evidence that she failed to substantially comply with the permanency plan. Second, Mother argues that the trial court erred by finding that DCS had proven by clear and convincing evidence the ground of persistent conditions. Mother does not challenge the trial court's best interest determination.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1)(2010). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K. B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *20 (Tenn. Ct. App. Oct. 7, 2011).

"No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citing *M.L.B v. S.L.J.*, 519 U.S. 102, 119 (1996)). The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *In re M.J.B.*, 140 S.W.3d at 653. Evidence satisfying the clear and convincing evidence standard establishes that the facts asserted are "highly probable and eliminates any

serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *13-14 (Tenn. Ct. App. Jan. 20, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9; 2003 Tenn. App. LEXIS 569, at *26 (Tenn. Ct. App. Aug. 13, 2003)). The evidence should produce a firm belief or conviction in the fact finder's mind as to the truth of the facts sought to be established. *In re A.T.P.*, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *14 (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

> The appellate court applies the clear and convincing evidence standard as follows: In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to the credibility of the witnesses. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed de novo on the record, affording them no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993); *In re Tiffany B.*, 228 S.W.3d at 156.

*In re Askia K. B.*, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *21-22.

ANALYSIS

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65; 120 S. Ct. 2054, 2059-60 (2000); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993); ***Ray***, 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons, it is not absolute. ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006); ***In re J.W.P.***, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. ***In re Audrey S.***, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002); ***In re S.M.***, 149 S.W.3d at 638; ***In re M.J.B.***, 140 S.W.3d at 652-53).

Mother has appealed both grounds for termination of her parental rights, failure to substantially comply with the permanency plan and also persistent conditions. We discuss each in turn. Although Mother has not appealed the trial court's best interest determination, we consider it as well.

### *Substantial Noncompliance with the Permanency Plan*

Mother first appeals the trial court's finding that she failed to substantially comply with the permanency plan under Tennessee Code Annotated § 36-1-113(g)(2). This subsection states that termination of parental rights may be based on a finding by clear and convincing evidence that: "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). For each child placed in foster care, DCS is statutorily required to develop an individualized plan of care that sets forth DCS's responsibilities and parental responsibilities that are reasonably related to achievement of the plan's goals; here, reunification or adoption. Tenn. Code Ann. §§ 37-2-403(a)(1)(A) and (2)(A) (2010). Parents are responsible for addressing the conditions that either led to the child's removal or prevent the child's safe return to the parent's custody, and they must make reasonable efforts once DCS has made services available to them. ***In re Tiffany B.,*** 228 S.W.3d at 159; ***In re Chase A.C.***, No. E2009-01952-COA-R3-PT, 2010 WL 3257711, at *18; 2010 Tenn. App. LEXIS 523, at *56 (Tenn. Ct. App. Aug. 18, 2010).

To consider whether Mother has substantially complied with the permanency plan, we, of course, start with a review of the permanency plan. The 16-page form permanency plan,

made an exhibit in the record, appears to be at once repetitive, confusing, and incomplete.[3] Various parts of the permanency plan set forth "action steps" for Mother, such as: "follow all recommendations of the assessment from treatment center & treatment specialist" and "provide a safe, stable residence for a period of no less than 6 months." The following excerpt is stated either as a "description of concern" or as part of the "underlying needs" for Mother at least 28 times[4] in the permanency plan:

> Needs a stable residence, financially responsible, pay child support, menatl [sic] health assessment to address stressors related to Abigail being removed from her care, follow recommendations from treatment center/treatment specialist.

Unfortunately, however, the permanency plan for Abigail nowhere includes a section labeled as the "statement of responsibilities" for Mother. This omission is not a mere technicality. As we have noted in a previous case: "[T]he statute that sets out this ground for termination states that parental rights may be terminated where there is substantial noncompliance 'with the *statement of responsibilities*' in the permanency plan." ***In re Askia K. B.***, 2011 WL 4634241, at *9 (quoting Tenn. Code Ann. § 36-1-113(g)(2)) (emphasis in original). ***See also State of Tenn. Dep't of Children's Servs. v. P.M.T.,*** No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *8; 2006 Tenn. App. LEXIS 608, at *23-24 (Tenn. Ct. App. Sept. 15, 2006) ("Tenn. Code Ann. § 36-1-113(g)(2) does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities"). Moreover, the statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for Mother in the permanency plan is a significant problem. It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

We note that there is no dispute on appeal about what most of Mother's responsibilities were under the plan, with the exception of DCS's request that Mother find a residence other than

---

[3]The permanency plan is for both Mother and Father; we focus only on the portions that relate to Mother.

[4]In 18 of the 28 times this paragraph is reproduced in the permanency plan, it includes the misspelling of "mental" as "menatl."

her mother's home.[5]  Consequently, in the alternative, we will consider the evidence on this ground for termination.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.  Termination of parental rights under Tennessee Code Annotated § 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.,* 140 S.W.3d at 656. To succeed under Section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.,* 140 S.W.3d at 656-57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)).  Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.,* 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12; 2003 Tenn. App. LEXIS 415, at *41-42 (Tenn. Ct. App. June 3, 2003)).  The Tennessee Supreme Court has explained how substantial noncompliance with a permanency plan should be assessed:

> Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial.  Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine,* 79 S.W.3d at 548.  Therefore, "[n]ot every failure to comply with a permanency plan will furnish grounds for termination." *In re K.E.R.*, No. M2006-00255-COA-R3-PT, 2006 WL 2252746, at *5; 2006 Tenn. App. LEXIS 525, at *14 (Tenn. Ct. App. Aug. 3, 2006).  "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* (quoting *In re M.J.B.*, 140 S.W.3d at 656).  Additionally, a parent's "improvement toward compliance

---

[5]Mother testified that DCS had talked to her about finding another residence, but Mother did not understand this to be a requirement.

should be considered in a parent's favor." *In re Valentine*, 79 S.W.3d at 549 (citing *State Dep't of Human Servs. v. Defriece,* 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)).

DCS acknowledges that Mother "did partially comply with some of the tasks enumerated in the permanency plans." It argues, however, that the central obligations in the permanency plan, designed to achieve reunification, were not fulfilled. First, DCS stresses that Mother continues to live in the family residence, where she was "allegedly drugged without her knowledge, assaulted, and the victim of other personal offenses." DCS concedes that Mother completed her parenting class requirement, but argues that Mother did not comply with the visitation requirement in the permanency plan because she "missed over half of her scheduled visits with the child." DCS also emphasizes Mother's use of alcohol in February 2011 and her decision not to inform counselor Bill Lockett about this relapse. DCS argues that this omission, coupled with Mother's reluctance to deal with the emotional pain of her past trauma, has diminished the effect of her therapy and "render[ed] her progress slow if not stagnant." This failure to fully engage in therapy, DCS contends, has rendered "two of the chief requirements of the permanency plan" unfulfilled. Finally, DCS points to the many years DCS has been involved with Mother's older children. It relies on case worker Boyd's testimony that many of Mother's problems have stayed the same and the Juvenile Court's finding that Mother "has never substantially complied with any Permanency Plans."

While the only child at issue in this appeal is Abigail, DCS rightly points to Mother's lengthy history with the Department, and the disturbing fact that, of her seven older children, two are being raised by relatives and Mother's parental rights have been terminated as to the rest. Mother's past behavior is clearly relevant as background for the evidence as to Abigail. *See In re Adoption of Kleshinski,* No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *22 (Tenn. Ct. App. May 4, 2005) (past circumstances can be considered as backdrop for evidence in current termination proceedings). We note, however, that DCS is obliged to present clear and convincing evidence as to both grounds and best interest as to the child at issue in *this* case, and while the evidence on Mother's past cases serves as the backdrop, our view of the evidence in this case cannot be skewed by Mother's past transgressions.

We consider first DCS's argument that Mother did not comply with the permanency plan requirement that she have a "stable residence." Based on DCS's argument that Mother should move out of the family residence, the Juvenile Court found that Mother "is still living in the same house where she was allegedly drugged and was knocked out by a chair" and Mother's " knowing failure to correct her circumstances . . . makes it unsafe for her to parent this child." Frankly, we are baffled by DCS's insistence that Mother move out of her mother's home and the Juvenile Court's agreement with this argument. The record contains

no evidence indicating that the house itself was physically unsafe or inadequate; to the contrary, the record indicates that the DCS caseworker conducted a home inspection and found the home physically adequate. Other residents in the home do not present a problem; the only other person in the house is Mother's seventy-seven-year-old mother, who does not drink alcohol. The record indicates that the house is debt free, and Mother is able to share the household expenses with her mother, so living in the family residence makes financial sense for Mother, in light of her income level and financial situation. DCS's argument is premised on the fact that the family residence was the setting for adverse incidents such as Mother's ex-boyfriend supposedly putting illegal drugs in her soft drink while she was pregnant with Abigail and Father hitting Mother over the head with a chair. But this has nothing to do with the physical home and everything to do with Mother's choices on persons with whom she associates, a separate requirement in the permanency plan. Such problems would surface again, wherever Mother lives, if she were to continue to associate with unsafe, inappropriate men. Thus, to the extent that the Juvenile Court viewed moving out of the family residence as a plan requirement, it is neither reasonable nor related to remedying the conditions that led to Abigail's removal from Mother's custody. ***See In re Valentine,*** 79 S.W.3d at 547 (where trial court makes no findings on reasonableness of plan responsibilities, the appellate court reviews the issue *de novo*). The evidence in the record does not support the Juvenile Court's finding that Mother did not substantially comply with the "stable residence" requirement in the permanency plan.

With respect to persons with whom Mother associates, the permanency plan lists as an "action step" for Mother: "will refrain from engaging with individuals who are participating in unlawful activity." The Juvenile Court found that Mother has "continued to keep contact with people who are not appropriate for the child to be around," stating that, in "February 2011, she was keeping company with known drug users and an indicated sex offender." It appears that the Juvenile Court was referring to the incident in which Mother's ex-boyfriend, indicated by DCS as a sex offender, purportedly put illegal drugs in her soft drink. However, this incident did not take place in February 2011; it occurred when Mother was pregnant with Abigail, obviously prior to the permanency plan at issue. We note that, in February 2011, Father came to Mother's home and hit her over the head with a chair. Certainly allowing Father into her home represents a poor choice by Mother, with disastrous results. However, she prosecuted Father for the offense, he was incarcerated for it, and Mother obtained an order of protection against him. Other than this incident, the record before us contains no evidence that, during the time period after implementation of the permanency plan, Mother was consorting with individuals who engaged in illegal activity.

As to financial matters, Mother testified that no child support obligation had been established for her, and DCS does not dispute this. The permanency plan states that Mother must be

"financially responsible" and, as an "action step," Mother was to "provide DCS with proof of a legal and verifiable income." The Juvenile Court summarized Mother's proof as follows:

> [Mother] testified that she has worked for Evans Farms for three years, and that she has attended school online since July 2010 with the expectation to graduate in December 2011. She testified she works at a fruit stand on Sundays and makes $7.00 per hour, and that she helps pay bills at her mother's home where she lives.

The Juvenile Court recounted testimony from therapist Lockett that Mother "was unemployed when she first came to him, and that she found employment in May after being let go from her last employment due to her boss retiring." It also summarized the testimony on this issue from DCS case worker Boyd: "[Boyd] testified that the Mother has had many jobs, the most recent of which Ms. Boyd has received no verification." It found that Mother had continued to have "unstable employment and income."

Returning to the requirements in the permanency plan, as we must in considering this ground for termination, the plan required Mother to be "financially responsible," and to have "legal and verifiable income." The evidence on this is somewhat of a mixed bag. Since custody of Abigail was removed from Mother, the proof showed that Mother had verified to DCS some of her income and employment but had not verified the employment she had at the time of trial. There is no indication that Mother spent her limited funds in a way that was not "financially responsible." However, the proof also shows that Mother's income was meager at best, and she was told by DCS that her income needed to be sufficient to support herself and her child. Given Mother's limited education, the online training in which she enrolled appeared reasonably geared toward enabling Mother to have sufficient income. Thus, overall, the record indicates that Mother was making substantial efforts to earn enough income to support herself and her daughter but had not yet achieved that level of income.

The permanency plan also indicated that Mother was required to visit with Abigail. The Juvenile Court's order observed that the DCS worker who transported the child for visits testified that Mother missed 32 out of 77 scheduled visits. This was dismissed by the Juvenile Court as missing "nearly half of her visits with the child." It is unclear whether the Juvenile Court held that Mother had not substantially complied with this plan requirement. The evidence indicated that getting to the twice-weekly visits was not easy for Mother, as she could not drive and had to take an hour-long bus trip each way. There was no evidence that

Mother went more than a week or two without seeing Abigail. Under all of these circumstances, we find that the evidence in the record shows substantial compliance with this plan requirement.

As to drug and alcohol use, the permanency plan indicated that Mother's participation in random drug screens was a "desired outcome," and that Mother needed to "follow recommendations from [the] treatment center/treatment specialist." In its order, the Juvenile Court noted Mother's February 2011 alcohol relapse, said that Mother had "never completed alcohol and drug treatment" and "has not had alcohol or drug treatment in at least three (3) years." It found that Mother had "ongoing . . . alcohol and drug issues." If this amounts to a conclusion that Mother did not substantially comply with this prong of the permanency plan, the evidence does not support such a conclusion. To be sure, Mother admits the incident of alcohol relapse in February 2011, and to the detriment of her treatment, she failed to tell counselor Lockett about the relapse. However, the record also indicates that she attended AA and NA meetings daily for 90 days, and after the February 2011 relapse she continued to attend, albeit not daily. Mother's drug screens were all clean, so drug and alcohol treatment was not recommended for her.[6] There is no evidence of drug or alcohol use other than the single February 2011 incident. This Court has previously cautioned against expecting perfection from parents who suffer from addiction issues:

> [I]t is imperative for courts handling parental termination cases to view substance abuse realistically. *In re M.J.M.,* No. M2004-02377-COA-[R3]-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005) . . . . Recovery from addiction will frequently entail "false starts and set backs, as well as successes and, regrettably, backsliding." *Id.* at *11 . . . . Drug addiction is not a condition that is "cured"; parents address it by managing it, that is, by following an established treatment program and refraining from the use of the drugs. *In re M.J.M.,* 2005 WL 873302, at *11.

*In re Joshua S.,* No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *12 (Tenn. Ct. App. June 16, 2011) (footnote omitted). Overall, the evidence in the record does not support a finding that Mother did not substantially comply with this plan requirement.

---

[6]The Juvenile Court acknowledged that no drug or alcohol treatment was recommended for Mother in her assessment, so the repeated references in the order, to Mother having not undergone treatment or having not undergone treatment in several years, do not make sense.

As to Mother's mental health, the permanency plan states that Mother was to have a mental health "assessment to address stressors related to Abigail being removed from her care," and "to address reasons for using alcohol and drugs," adding: "All recommendations will be followed." The Juvenile Court order found that Mother was substantially noncompliant with the permanency plan in this regard, stating that Mother "showed little desire to work on trauma issues, which are the focus of her need for therapy," and that "she will not attempt to work on the issues causing her mental health concerns." The order concluded that Mother "has failed to engage in counseling in a meaningful and productive way."

Respectfully, the evidence in the record, viewed as a whole, is not consonant with the Juvenile Court's conclusion. From the description of counselor Lockett, Mother faced substantial functionality issues and emotional issues from past trauma. Lockett said that Mother had made "significant strides" functionally, from where she started. He said that Mother was "working hard" and "put forth effort" in the counseling. On Mother's past trauma, Lockett indicated that she had disclosed to him at least some of the trauma she had suffered, and he commented that the trauma she had disclosed would surely cause "a significant amount of emotional pain." Describing Mother's efforts to summon the courage to address the trauma, Lockett testified:

> She will begin almost every time to work on them. The impression I get from seeing her reaction in the office is that the pain, the emotional pain, is such a significant degree that she just can't force herself to go there.

Thus, the evidence indicates that Mother started counseling with a full plate of problems and issues, engaged with the counseling and resolved the most pressing functionality issues, and put forth effort on her emotional issues but has not resolved them. As with addiction issues, parents who have mental health issues such as those facing Mother " 'can turn their lives around,' but must be given the time and opportunity to do so." *In re Joshua S.,* 2011 WL 2464720, at \*12 (quoting *In re D.J.R.*, No. M2005-02933-COA-R3-JV, 2007 WL 273576, at \*5-6 (Tenn. Ct. App. Jan. 30, 2007)). The permanency plan required Mother to have a mental health assessment to address addiction issues and stressors related to losing custody of her child and to follow the assessment recommendations. Contrary to the Juvenile Court's finding, the undisputed evidence shows that Mother in fact "engage[d] in counseling in a meaningful and productive way." She made "significant strides" in her numerous functionality challenges and continued to make efforts to tackle her painful past trauma. The evidence does not support a factual finding of substantial noncompliance on this requirement.

Overall, in reviewing the specific facts found by the Juvenile Court below regarding substantial compliance with the permanency plan, it appears that, to a significant degree, they were based on the fact that the outcomes and goals in the permanency plan were not met, with little acknowledgment of Mother's efforts to reach them. As to this ground for termination, the parent's efforts to accomplish his or her responsibilities under the permanency plan must factor into the court's consideration. *See In re Valentine,* 79 S.W.3d at 549 (a parent's "commendable efforts . . . toward compliance should be considered in a parent's favor."). *See also In re B.D.,* No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8; 2009 Tenn. App. LEXIS 263, at *24 (Tenn. Ct. App. Mar. 2, 2009)("[T]he juvenile court improperly based its finding of substantial noncompliance upon the fact that DCS's outcomes and goals were not reached rather than Mother's efforts to reach them. This Court has made clear that outcome achievement is not the measure of compliance.") (citing *P.M.T.,* 2006 WL 2644373, at *8; 2006 Tenn. App. LEXIS 608, at *23-24).

In the case at bar, when Abigail was taken into protective custody, Mother faced daunting challenges on many fronts. Having lost custody and, in most cases, her parental rights as to seven previous children, Mother failed a prenatal drug screen as to her eighth child. With significant trauma in her background, Mother had borderline personality disorder, anxiety disorder, post-traumatic stress syndrome, substance addiction and abuse, a long record of petty crime, no education beyond a G.E.D., no driver's license, meager employment, a history of relationships with inappropriate men, and an ongoing relationship with a violent and abusive man, namely, Father. She ended her relationship with Father, prosecuted him and obtained a order of protection, attended numerous AA and NA meetings and maintained sobriety with one exception, maintained some employment and obtained online training for better employment, maintained appropriate housing, rode the bus for regular visits with Abigail, made "significant strides" in functionality through regular counseling, and continued to try to confront painful past trauma to address the root causes of her issues. As set forth above, in considering this ground for termination, the Court is obliged to consider these efforts in Mother's favor.

Having reviewed the specific facts as found by the trial court or as supported by a preponderance of the evidence, we look at whether the combined weight of the facts clearly and convincingly establish substantial noncompliance with the permanency plan. As in *In re Valentine,* we consider specific responsibilities with which Mother substantially complied and those with which she partially complied, weighing the significance of the particular compliance and the extent of Mother's efforts. Based on the record before us, we cannot say that there is clear and convincing evidence of substantial noncompliance with the permanency plan. Therefore, we must reverse the holding of the Juvenile Court as to this ground for termination.

*Persistent Conditions*

The Juvenile Court also held that DCS established by clear and convincing evidence the ground for termination often referred to as "persistent conditions." The statute on persistent conditions states that there are grounds for termination where:

> 3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>>
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>>
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A-C).

Mother argues that the grounds for removal of Abigail from her custody were related to Mother's drug use during her pregnancy, Mother's mental issues, and her overall instability. Mother suggests that the Juvenile Court incorrectly found that the ground of persistent conditions had been proven and argues that the "testimony at trial paints a different picture." With respect to the alcohol and drug addictions, Mother argues that the proof offered at trial showed that she has had no "dirty drug screens." She acknowledges one significant alcohol relapse but emphasizes that there was no other evidence of alcohol or drug use. Mother also points to her attendance at AA and NA meetings, which demonstrated a real "effort to deal with her drug addiction." Mother stresses that she completed a parenting assessment which involved therapy sessions, parenting classes, drug and alcohol after-care, and sobriety meetings. Mother also points to the affirmative steps she took to remove the threat of domestic violence from her home by pressing charges against Father and obtaining a protective order against him. All of this, she insists, demonstrates "fundamental changes and

adjustments to her life to change the conditions that led to the removal" and "considerable progress in dealing with these issues."

Parents whose children are taken into protective custody sometimes face multiple serious obstacles to healthy parenting: mental and emotional problems, physical difficulties, addiction, lack of education or training to earn sufficient income, to name a few. Often the problems are longstanding and difficult to remedy, even with a permanency plan tailored to their needs and significant assistance from DCS. Even if such a parent makes herculean efforts to address his or her issues, serious obstacles may remain, leaving the child with a parent who is not, and may never be, able to safely parent the child. As this Court has explained, the ground of persistent conditions was enacted by the Legislature to address this dilemma:

> Thus, children removed from their parents' custody because they were dependent, neglected, or abused were often caught in a legal whipsaw. They could not be returned to their parents, because their parents had not improved to the point of being able to provide them with a suitable home, but they could not be adopted into stable and permanent homes either, because as long as their parents made some effort, however minimal, to improve, their parental rights could not be terminated. . . . These children often languished for years in state custody or foster care until they simply "aged out" of the system.
>
> * * *
>
> The legislation [adopting persistent conditions as a ground for termination] recognized the critical role of permanence and stability . . . . [It] broadened the law's almost exclusive focus on the behavior and wishes of the parent to include consideration of the effects of prolonged state custody or foster care on the welfare of the child.
>
> * * *
>
> [T]his new ground for termination focused on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them. In addition, the new ground asked whether the child could be returned to the parent "in the near future,". . . rather than whether the child might be able to be returned "at some future date."

*In re Audrey S.,* 182 S.W.3d 838, 873-74 (Tenn. Ct. App. 2005) (citations omitted). Mother's arguments on this ground for termination emphasize Mother's significant efforts to address the array of challenges to her ability to safely parent Abigail. While these efforts

are part of our analysis on substantial noncompliance with the permanency plan, the ground of persistent conditions focuses on whether the parent's efforts have been fruitful, i.e., whether the parent has remedied the conditions that led to the child's removal or whether those conditions "will be remedied at an early date . . . in the near future." *Id.;* Tenn. Code Ann. § 36-1-113(g)(3)(A) and (B).

We review the evidence with this standard in mind. As discussed above, Mother began these proceedings far behind the finish line, with many road blocks to having custody of Abigail returned to her. Mother's "commendable efforts" produced notable results and brought her closer to the finish line, so to speak. *In re Valentine,* 79 S.W.3d at 549. Nevertheless, the proof shows that "the conditions which led to the removal" of Abigail from Mother's custody "still persist." After assessment, Mother was diagnosed by Dr. Greaves and counselor Lockett as having borderline personality disorder, anxiety disorder, post-traumatic stress syndrome, and addiction. As noted by the trial court, Mother has a long history of choosing "inappropriate males." Any one of these problems would be formidable. This Court has recognized that borderline personality disorder alone presents a serious challenge to a person's ability to safely parent a child and can be controlled only with substantial therapy. ***See Tenn. Dep't of Children's Servs. v. Bates,*** 84 S.W.3d 186, 192, 197 (Tenn. Ct. App. 2002) (finding a mother's borderline personality disorder and pattern of instability in relationships, coupled with a failure to fully participate and attend therapy, resulted in a finding of persistent conditions, among other grounds for termination).

The trauma in Mother's past appears from the evidence to underlie Mother's most intractable conditions. Dr. Greaves stated in her testimony that borderline personality disorder is often an "outgrowth" of past trauma. Mother's borderline personality disorder, Dr. Greaves said, could lead to Mother "neglecting or not recognizing the emotional needs of a child" and could potentially damage Abigail's ability to attach emotionally. The instability resulting from Mother's borderline personality disorder could cause Abigail to have emotional and behavioral problems. Counselor Lockett testified that, while Mother had made functional progress in therapy, she had not yet been able to tackle the emotional issues stemming from her significant history of trauma. Lockett said that Mother would likely need to continue working on these issues for an indeterminate but "significant period of time." Dr. Greaves' testimony was consistent with Lockett's assessment.

The proof shows that the conditions that most hinder Mother's parenting – borderline personality disorder, anxiety disorder, post-traumatic stress syndrome – go unaddressed so long as Mother is unable to bring herself to confront her history of trauma in counseling. Moreover, Mother's sobriety and ability to avoid relationships with "inappropriate males"

are at risk as well. In addition, while Mother has taken steps to improve her ability to earn income, as noted by the trial court, the proof indicates that Mother will continue to be in a state of financial instability. All of these conditions would likely cause Abigail to be subjected to either abuse or neglect and prevent her safe return to Mother's custody, and there is little likelihood that they will be remedied at an early date. Under these circumstances, the continuation of Mother's relationship with Abigail "greatly diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(C).

Overall, we hold that the record supports the trial court's finding that the ground of persistent conditions was established by clear and convincing evidence.

### *Best Interest*

Although Mother has not appealed the Juvenile Court's finding that termination of her parental rights was in Abigail's best interest, we nevertheless review the evidence on this essential element, in light of its paramount importance. The Juvenile Court found that Mother had not made sufficient adjustment in her circumstances to make it safe to return Abigail to Mother's custody. It also found that, despite Mother's visitation with Abigail, the child was bonded to her foster family, not Mother, and a change of caretakers would likely have a very negative effect on the child. From our review of the record, clear and convincing evidence supports these findings and supports the Juvenile Court's overall holding that termination of Mother's parental rights is in Abigail's best interest.

### CONCLUSION

The decision of the trial court is affirmed in part and reversed in part. Costs on appeal are assessed against Respondent/Appellant J.R.K., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE